IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-00200-PAB-CBS

(Consolidated with Civil Action Nos. 09-cv-00215-PAB-CBS and 09-cv-00296-PAB-CBS
and 09-cv-00606-PAB-CBS)

In re LEVEL 3 COMMUNICATIONS, INC. SECURITIES LITIGATION
_____

**ORDER**
_____

This matter is before the Court on defendants' combined motion and brief to

dismiss lead plaintiff's amended consolidated complaint [Docket No. 103] and motion

requesting an order taking judicial notice [Docket No. 106].  The motions are ripe for

disposition.

**I.  FACTUAL BACKGROUND**

Plaintiff William A. Poppo is the Lead Plaintiff in this consolidated action.  Poppo

has filed a 135-page amended consolidated class action complaint ("complaint")

[Docket No. 100] in which he excerpts long passages from documents and transcripts

and also cross-references factual allegations across multiple pages.  Boiled down to its

essence, the complaint alleges that, between October 17, 2006 and October 23, 2007

(the "Class Period"), defendants misled the investing public about the progress and

success of Level 3's integration of a number of acquired companies.

Plaintiff purchased Level 3 securities during the Class Period and has alleged

suffering damages since that time.  The individual defendants, who held officer and

board positions with Level 3 during the Class Period, are James Q. Crowe (Chief

Executive Officer), Kevin J. O'Hara (Chief Operating Officer), Sunit S. Patel (Chief Financial Officer), Walter Scott, Jr. (Chairman of the Board), and Charles "Buddy" C. Miller, III (Vice Chairman of the Board and Executive Vice President).

Level 3 provides network telecommunication services to companies of varying size. Its clients include "national and international carriers, cable companies, wireless companies, and voice service providers." Docket No. 100 at 19, ¶ 29.[1] Anticipating greater usage of its network for transferring of content such as video over the internet, Level 3 sought to expand its physical network through acquisition and integration of the communications networks controlled by competing companies. Level 3 began doing so in 2005, describing itself as a "logical consolidator with proven integration experience." Docket No. 100 at 36, ¶ 65; *see* Docket No. 100 at 36, ¶¶ 66-67. The amended consolidated complaint describes the circumstances surrounding the acquisition of WilTel Communications Group LLC ("WilTel"), Progress Telecom, ICG Communications, Inc., TelCove, Inc. ("TelCove"), Looking Glass Networks Holdings Co., Inc., and Broadwing Corporation ("Broadwing"). Of prominence in the complaint, however, are the WilTel and Broadwing acquisitions. Plaintiff alleges that "[d]efendants were motivated to mislead the market about the successful integration of WilTel to artificially inflate Level 3's stock price, which made the acquisition of Broadwing less expensive." Docket No. 100 at 6-7, ¶ 7. Plaintiff alleges that the defendants misled the market by stating that the WilTel integration was progressing well despite knowing that it was "behind schedule and riddled with complications." Docket No. 100 at 8, ¶ 9.

---

[1]Level 3 also has some coal mining operations.

Plaintiff cites the following examples of allegedly misleading statements by defendants between October 17 and December 4, 2006:

1.      "We continue to run ahead of plan and have now completed the majority of integration efforts from WilTel, and we have completed these activities under budget." (O'Hara, October 17, 2006)

2.      "We continue to run ahead of plan on the WilTel integration from both a timing and budget perspective.  A majority of the physical network interconnections are completed, data centers have been consolidated, network expenses have been reduced, and most of the operating expenses run rate savings have been realized.  This work has been completed ahead of schedule and under budget." (O'Hara, October 24, 2006)

3.      "We have [been] working on integration tasks and it's well over 200 people, so it's a big effort for us, one we take seriously and one we think we are developing pretty good skills in."  (Crowe, October 24, 2006)

4.      "When you do these [sic] many acquisitions in such a short period of time makes [sic] me nervous also, so we spend a lot of time worrying a lot and monitoring things quite carefully.  You are right on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts." (Patel, December 4, 2006)

Docket No. 100 at 31, ¶ 54; 33, ¶¶ 58-59; 35, ¶ 64 (emphasis removed).[2]  On

---

[2]Plaintiff also cites portions of third-party analyst reports from the Class Period, such as the following:
- "Management stated that it had completed the integration of WilTel (which closed in December, 2005), well ahead of the initial target of completing integration in 15-18 months." (J.P. Morgan, October 20, 2006)
- "Our meeting reinforced our confidence level in [Level 3's] ability to rapidly integrate [Broadwing] in 2007, setting the stage for a likely strong 2008." (second alteration in original) (November 2006)
- "[P]roduct integration is done" and "physical network integration [is] largely done . . . except Broadwing, which should be complete within [the] next two months." (latter two alterations in original) (May 2007).

Docket No. 100 at 7, ¶ 8; 124, ¶ 205 (emphasis removed).

November 9, 2006, Level 3 filed a Form 10-Q with the SEC, containing third quarter results for 2006 and reporting that "[d]uring 2006, the Company integrated a significant portion of WilTel into the business." Docket No. 100 at 35, ¶ 63 (emphasis removed).

The complaint also includes significant portions of additional surrounding text. For instance, during the same conference call with analysts and investors in which Crowe made the first statement cited above, he also said:

> I'm going to add one more comment, because I do know this is an important matter to many of our investors. I would say that we enter into any discussion about acquisitions fully aware that more than half of all acquisitions destroy value for the acquiring company's shareholders – more than half. That is because, at least in our view, people – either the companies either overpay or don't plan the integration properly, or both.
>
> * * *
>
> We, I think[,] through the last three or four years[,] demonstrated a healthy concern about any acquisition. And we have worked very hard . . . it is important to have all the questions as well as you can about integration answered before you sign.

Docket No. 100 at 32, ¶ 55 (emphasis removed).

Plaintiff pleads the following facts known to defendants in support of its claim that the foregoing statements between October 17 and December 4, 2006 were misleading when made: (1) "[B]y mid-December 2006, the WilTel network integration was behind schedule and over budget," Docket No. 100 at 37, ¶ 69(a)(i); (2) Level 3 had terminated most of the WilTel personnel with the expertise required for a smooth integration, Docket No. 100 at 38-39, ¶ 69(b), (c) (f); (3) as early as March 2006, Level 3 was still using multiple systems which resulted in significant delays in completing orders for customers, Docket No. 100 at 39, ¶ 69(d); and (4) customers had begun complaining about the delays, Docket No. 100 at 39, ¶ 69(e).

On February 8, 2007, O'Hara informed analysts and investors on a conference call that the "integration of all the acquired companies is progressing well and we're beginning to see the benefits of synergies from those transactions."  Docket No. 100 at 40, ¶ 72 (emphasis removed).  He stated that Level 3 had "approximately 525 to 550 quota-bearing salespeople and . . . expect[ed] to further increase the size of [its] sales force as [it went] through the year."  Docket No. 100 at 40, ¶ 72 (alterations added, emphasis removed).  O'Hara added that "[m]ost of the physical integration of WilTel is now complete" and that "[t]he remaining activities for WilTel are primarily tied to ongoing IT system development work." Docket No. 100 at 41, ¶ 72 (emphasis removed).  Crowe stated that Level 3 "will be substantially done [with integrating its services] by the end of the first quarter."  Docket No. 100 at 41, ¶ 73 ("That is, our sales force will have a very clear set of services to sell by the end of the first quarter.").

To demonstrate that the statements defendants made on February 8, 2007 were knowingly false and misleading, plaintiff pleads (1) that defendants were in possession of data indicating that the WilTel integration "was behind schedule and over budget," (2) the company was still using multiple systems causing customer delays as of February 2007, (3) the integration of TelCove had been delayed, and (4) the company had terminated the employees of the legacy companies with requisite knowledge.  Docket No. 100 at 42-44, ¶ 77.

Plaintiff alleges that defendants misled the investing public again about the progress of integration during an April 26, 2007 conference call.  When reporting on results for the first quarter of 2007, O'Hara informed investors and analysts that "[w]e made significant progress on the integration of all acquisitions. . . ."  Docket No. 100 at

5

45, ¶ 79 (emphasis removed).  Plaintiff also emphasizes the following statement by

O'Hara: "We are equally focused on insuring that the excellent reputation that Level 3

has earned over the years for customer service does not get degraded." *Id.* (emphasis

removed).  After saying that, however, O'Hara added that "[i]t is inevitable that as

employees from seven companies learn new business processes and systems, that

some inefficiency will be incurred during the transition." *Id.*  Then, O'Hara added that

"[t]he overall integration effort is tracking within expectations in this regard, and the

overall customer experience is still positive." *Id.* (emphasis removed).  Plaintiff also

alleges that defendants misled investors during the April 26 conference call by claiming

that integration efforts were their first priority.  Crowe stated: "We understand that this

job is our operational challenge and our opportunity and it is job #1, and we are

determined to insure that Level 3 ends 2007 with one network platform, one set of

business processes, and most importantly, with an organization with one set of

common values."  Docket No. 100 at 46, ¶ 80 (emphasis removed).[3]  Then, on May 15,

2007, Patel stated the following at the Morgan Stanley Communications Conference:

> Over the last year and a half we have been very busy on acquisitions.  I
> think we picked up about 7 companies.  So this year is really focused on
> integration and getting the synergies from all those acquisitions.  So that
> is really our top priority.

Docket No. 100 at 46, ¶ 83 (emphasis removed).

---

[3]Bear Stearns issued an analyst report on May 9, 2007 regarding a meeting
"with executives from Level 3, including CEO Jim Crowe, CFO Sunit Patel, and COO
Keven O'Hara." Docket No. 100 at 46, ¶ 81 ("Key topics addressed include integration
progress . . .").  The report stated that "[t]hough Level 3 is engaged in a challenging
integration of seven properties, management indicated that integration efforts were
proceeding as expected."  *Id.*

Plaintiff alleges that, when making the statements in April and May, 2007, defendants knew or recklessly disregarded that: (1) "the integration of the acquired companies was making little if any progress as of May 2007," Docket No. 100 at 47, ¶ 85(b); (2) "Level 3 customer complaints were escalating due to the Company's continuing failure to provision and fulfill customer orders on a timely basis," Docket No. 100 at 48, ¶ 85(c); (3) "the Company's provisioning of products and services suffered material delays, in some instances taking up to 50% to 75% longer," Docket No. 100 at 48, ¶ 85(d); (4) "customers attempting to have their complaints regarding order fulfillment delays addressed at the WilTel call center faced nearly a 700% increase in waiting times, from 3 to 20 minutes, because customer service representatives had been terminated," Docket No. 100 at 48-49, ¶ 85(d); (5) "Level 3 was continuing to simultaneously use multiple network inventory and provisioning systems inherited from the acquired businesses, resulting in significant delays in provisioning and fulfilling customer orders," Docket No. 100 at 49, ¶ 85(e); and (6) "Level 3 also was still experiencing the impact of its premature termination of subject matter employees and its failure to adequately train its remaining employees to work within the numerous order tracking and provisioning systems being used to fill customers' orders."  Docket No. 100 at 49, ¶ 85(f).

Plaintiff excerpts long passages from a July 26, 2007 conference call with analysts and investors that he claims also contain materially misleading statements. For example, defendant O'Hara stated: "We made significant progress on the integration of all acquisitions" and, "[m]oving to integration, this quarter we made good progress on the overall integration front."  Docket No. 100 at 50, ¶ 87 (emphasis

7

removed).  The complaint, however, contains the surrounding statements made by

defendant O'Hara, statements which largely disclose the difficulties plaintiff cited as

having been concealed from the investing public.  For instance, defendant O'Hara

stated that "[a]s I've mentioned previously, it's inevitable that as employees from seven

companies learn new business processes and systems, that some inefficiency will be

incurred during the transition.  During the quarter, we experience [sic] some of this

inefficiency and as a result, performance in certain operational areas did not meet

expectations."  Docket No. 100 at 50, ¶ 87.  He stated that "where we have not fully

developed or implemented the end-state processes and systems, our employees are

being trained on and need to operate with elements of many of the legacy systems."

Docket No. 100 at 51, ¶ 87.  More specifically, defendant O'Hara disclosed that

> Operating in this interim environment has added operational complexity
> to certain functions.  As a result of this complexity, the average period of
> time it takes to convert certain new service orders into revenue has been
> extended by up to 50 to 75%.  This challenge has been compounded by
> the historically high level of sales that we've seen.  The effect of the
> challenge was a dampening in growth of core revenue during the quarter,
> particularly in wholesale markets.  This hybrid environment will continue
> in varying degrees until the development of the end-state systems are
> completed. We're implementing new systems releases in regular intervals
> during 2007 and the work will continue through 2008.  While this is the
> most complex part of the integration, we remain confident in our end-state
> architecture and will make meaningful progress towards our end-state
> environment during the balance of 2007.

Docket No. 100 at 51, ¶ 87 (emphasis removed).  Defendant Crowe expressed

confidence that the problems would be addressed, stating that they are under the

defendants' control.  Docket No. 100 at 51, ¶ 87.  He also observed that "the problems

that are lingering are long-term."  Docket No. 100 at 51, ¶ 88.

At a conference on September 11, 2007, defendant Patel stated that when

defendants reported on second quarter results, they disclosed "some speed bumps." Docket No. 100 at 52, ¶ 90.  Despite strong sales, they "were having difficulties turning those sales into billable revenue."  *Id.*  By September 11, however, they had "stabilized the situation."  *Id.*  Patel reported: "Our backlogs are no longer increasing, which means that our installed levels for turning company services are keeping up with the level of sales activity."  *Id.*

When defendants made these July and September statements, plaintiff contends that they knew or recklessly disregarded that: (1) the company had not made significant progress on the integrations of the acquired companies; (2) despite partial disclosure of provisioning delays, the integration of the companies was behind schedule; (2) customer complaints continued during this period; and (3) the reason the customer order backlog had stabilized was that the company "intentionally constrained" sales.  Docket No. 100 at 52-54, ¶ 93.

Toward the end of the Class Period, on October 15, 2007, Level 3 announced that it would be searching for a new CFO to replace Patel.  Level 3's stock price fell from $4.90 on October 12 to $4.36 on October 15.  *See* Docket No. 100 at 54, ¶ 95.  By October 17, 2007, the stock price had declined to $4.20.  Then, on October 23, 2007, Level 3 adjusted earnings guidance for fiscal years 2007 and 2008 due to the aforementioned difficulties provisioning orders during the Class Period.  *See* Docket No. 100 at 55, ¶ 96.  Crowe explained:

> During the second quarter earnings call, . . . . we said we were having provisioning problems, but we had strong sales and we believed we would see significant improvement in our provisioning capabilities and that we would convert already-signed orders to revenues sufficient to meet the guidance. While we did achieve third quarter '07 guidance, the

> improvements we saw were simply not enough. . . . I'm very disappointed by our performance and I want to personally assure investors that we understand the seriousness of the situation. . . . Simply put, our company did not increase provisioning throughput in the time frame we had planned and expected at the end of – second quarter of 2007. . . .

Docket No. 100 at 55-56, ¶ 96 (emphasis removed).  Crowe also stated that

> at the time, we believed that if we were to have problems meeting our financial goals, sales, not operations, would be the likely cause.  And given the complexity of working with multiple systems, we expected some problems to arise but we believed we could quickly resolve those issues.  There was nothing fundamentally wrong with this approach.  However, we made several decisions which, while reasonable at the time, when viewed in retrospect today made achieving our provisioning targets more difficult.

Docket No. 100 at 56, ¶ 97.

Crowe recognized that one source of their difficulties was laying off employees of acquired companies with relevant expertise.  *See* Docket No. 100 at 57, ¶ 98.  He also admitted that the "reason we . . . remained optimistic for too long is because at the executive level, we took our eye off the detailed essential work of end to end provisioning that is critical to provisioning success."  Docket No. 100 at 57, ¶ 99 (emphasis removed).  During the same October 23, 2007 call, O'Hara stated that the "integration is going well in all of the other areas.  The really complicated stuff, though, is the service delivery and service management . . . ."  Docket No. 100 at 59, ¶ 102 (emphasis removed).  After the October 23, 2007 disclosures, Level 3's stock price declined dramatically, from $4.32 on October 22, 2007 to $3.28 on October 23 and then fell to $3.18 on October 24.  *See* Docket No. 100 at 59, ¶ 103.

Plaintiff provides what it alleges to be statements beginning in November 2007 which constituted admissions by defendants of "what they previously knew about the details of the Company's provisioning problems and the failed integration process

10

during the Class Period."  Docket No. 100 at 81, ¶ 147.  For example, plaintiff points to statements by defendants in November and December 2007 describing the difficulties the company was having with the integration process.  During that same time period, defendants explained that the stabilization in backlogged orders reported in September was a result of a decrease in orders being placed by customers due to the company's struggles to provide prompt service.  A December 3, 2007 analyst report also included defendant Crowe's statements that the company had "[s]tumbled in integration," oversold its services, had likely lost forty percent of the customer order backlog, and erred in laying off too many "people with network knowledge."  Docket No. 100 at 83, ¶ 150.  Plaintiff also includes a block quote of statements by defendant O'Hara during a February 7, 2008 conference call regarding some of the integration difficulties the company experienced over the previous eighteen months.  That same day, the stock price declined from $3.14 to $3.00.

On March 3, 2008, defendant O'Hara explained to analysts and investors the steps the company was taking to fix the problems.  One week later, the company announced that O'Hara was stepping down immediately and that, despite having previously announced a search for a new CFO, defendant Patel would remain as the company's CFO.  The stock price declined from $2.18 on March 9, 2008 to $1.87 on March 10, 2008.  Statements by other company executives in March 2008 referenced problems with the integration of the companies dating back to as early as January 2007.  On April 23, 2008, defendant Crowe told analysts and investors that the company's "problem was not caused by market demand, pricing or our inability to market and sell our services, but, rather to bottlenecks in our service activation

11

processes, which we could and should have prevented." Docket No. 100 at 87, ¶ 157

(emphasis removed). On April 28, 2009, defendant Patel stated that the company's

sales "are still plagued by 'integration issues and the customer experience issues that

we have created for ourselves.'" Docket No. 100 at 90, ¶ 161.[4]

The complaint includes a section entitled "Additional Allegations of Scienter."

Plaintiff details the various reports produced during the Class Period which documented

for defendants the progress of the integration process. While most of those allegations

simply describe the general nature, rather than the specific substance, of the reports,

plaintiff does allege that certain reports reflected "installation delays." *See* Docket No.

100 at 109, ¶ 180(c); *see also* Docket No. 100 at 110, ¶ 180(e) (averring that the

"Network Integration Weekly Operations Review" reports "showed the significant delays

in completing the integration of the transport interconnects"). For example, plaintiff

alleges that defendants were aware of the order backlogs and customer complaints

during the Class Period; that defendants held themselves out to be integration

specialists during the relevant period; and that the misrepresentations regarding the

integration of WilTel permitted Level 3 to acquire Broadwing on better terms and

refinance debt at more favorable interest rates. *See* Docket No. 100 at 116-17, ¶ 189-

91. Plaintiff also alleges that Level 3 executives were paid bonuses tied to company

performance during 2006 and sold Level 3 shares during the Class Period.

Plaintiff alleges the foregoing in support of his claims against defendants for

---

[4]Plaintiff also details information received from confidential witnesses regarding
the extent to which Level 3 struggled to integrate the acquired companies and the
significant impact of having laid off so many experienced employees. *See generally*
Docket No. 100 at 90-108.

violation of §10(b) of the Securities Exchange Act, Rule 10b-5, and §20(a) of the

Securities Exchange Act.  Defendants contend that plaintiff's complaint fails to meet the

pleading requirements of Rules 8(a) and 12(b)(6) of the Federal Rules of Civil

Procedure and the Private Securities Litigation Reform Act.

## II.  DISCUSSION

### A.  Federal Rule of Civil Procedure 8(a)(2)

Defendants argue that plaintiff's complaint fails to satisfy Federal Rule of Civil

Procedure 8(a)'s "requirement to plead a 'plain statement of the claim.'" Docket No. 103

at 13.  The Court agrees.  Plaintiff's complaint is 135 pages long and consists of 237

paragraphs, many of which contain sub-paragraphs.  There is no need for such length

and complexity considering the highly repetitive quality of the allegations.  The "extreme

length of the . . . [c]omplaint is an independent ground for dismissal, pursuant to Rule

8(a)(2) of the Federal Rules of Civil Procedure, which requires that a pleading contain 'a

short and plain statement of the claim showing that the pleader is entitled to relief.'"

*Woodward v. Raymond James Financial, Inc.*, --- F. Supp. 2d ---, 2010 WL 3239411, at

*1 n.2 (S.D.N.Y. Aug. 16, 2010) (citing *Local No. 38 Intern. Bhd. of Elec. Workers*

*Pension Fund v. American Express Co.*, --- F. Supp. 2d ---, 2010 WL 2834226, at *1

(S.D.N.Y. July 19, 2010)); *see Patel v. Parnes*, 253 F.R.D. 531, 554 n.198 (C.D. Cal.

2008) (collecting and discussing cases).  As the court in *Local No. 38* pointed out,

"[w]hile securities fraud claims must be pled with particularity, a plaintiff need not lard a

pleading with streams of consciousness from confidential witnesses and block quotes

from analyst calls."  2010 WL 2834226, at *1.  In that case, much like here, "[p]laintiff's

13

hydra-like complaint sprawl[ed] over 243 paragraphs, some silted with more than 500 words." *Id.*; *cf.* Docket No. 100 at 83-86, ¶ 151 (1221 words).  The "hydra-like complaint" in this case should, at a minimum, be dismissed without prejudice. However, considering the fact that plaintiff has already been afforded the opportunity to amend his consolidated class action complaint, the Court has sorted through the complaint to determine whether it states a claim and, for the reasons set forth below, finds that it does not.

## B.  Federal Rule of Civil Procedure 12(b)(6) and the PSLRA

When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[5]  In most civil actions, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2).[6]  Civil actions alleging securities fraud, however, are

----

[5]Moreover, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*  Defendants have filed an unopposed motion requesting judicial notice [Docket No. 106] of various publicly-available documents.  Here, however, the complaint fails to state a claim on its face, thus obviating the need to refer to the substance of the documents filed by defendants.

[6]Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual matter that, taken as true, makes his "claim to relief ... plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted).

subject to a heightened pleading standard.  Prior to the enactment of the Private

Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737,

securities fraud actions were analyzed by the pleading standards of Federal Rule of

Civil Procedure 9(b), which required that "the circumstances constituting fraud . . . be

stated with particularity," though "[m]alice, intent, knowledge, and other condition of

mind of a person, may be averred generally."  Fed. R. Civ. P. 9(b); *see Tellabs v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).

The PSLRA, which now applies to such actions, requires that the complaint

"specify each statement alleged to have been misleading, the reason or reasons why

the statement is misleading, and, if an allegation regarding the statement or omission is

made on information and belief, the complaint shall state with particularity all facts on

which that belief is formed."  15 U.S.C. § 78u-4(b)(1).[7]  Furthermore, when recovery

under the securities laws turns "on proof that the defendant acted with a particular state

of mind, the complaint shall, with respect to each act or omission alleged to violate this

chapter, state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "Congress left the key

term 'strong inference' undefined," but the Supreme Court has held that, "[t]o qualify as

'strong' . . ., an inference of scienter must be more than merely plausible or reasonable

---

[7]The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)."  *Tellabs*, 551 U.S. at 313.  "Private securities frauds action, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."  *Id.*

– it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see id.* at 324, 328 (stating that the "inference that the defendant acted with scienter need not be irrefutable" but must be "at least as likely as any plausible opposing inference" ).[8]

## C. Section 10(b) and Rule 10b-5

In their motion to dismiss, defendants argue that plaintiff has failed to plead with particularity a material misrepresentation or omission or to plead particularized facts creating a strong inference of scienter.  The Court agrees.

Plaintiff brings his suit pursuant to § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Section 10(b) prohibits "any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j.  Rule 10b-5 provides that "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact

---

[8]In so holding, the Supreme Court resolved a circuit split regarding "whether, and to what extent, a court must consider competing inferences in determining whether a securities fraud complaint gives rise to a 'strong inference' of scienter." *Id.* at 317-18. The Tenth Circuit had previously determined that courts should not consider "[w]hether an inference is strong . . . in a vacuum," and that it would "evaluate plaintiff's suggested inference in the context of other reasonable inferences that may be drawn." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187-88 (10th Cir. 2003); *see Tellabs*, 551 U.S. at 323 ("The strength of an inference cannot be decided in a vacuum.").  The Court declined to reach the question of whether recklessness is sufficient, but noted that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required."  *Tellabs*, 551 U.S. at 319 n.3; *see Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003) (defining scienter as "intent to defraud or recklessness").

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

The elements of a Rule 10b-5 claim are:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).  "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

As an initial matter, "[t]he story in this complaint is familiar in securities litigation.'"  *Caprin v. Simon Transportation Services, Inc.*, 99 F. App'x 150, 162 (10th Cir. 2004) (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990).

> "At one time the firm bathes itself in a favorable light.  Later the firm discloses that things are less rosy.  The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition . . . .  There is no 'fraud by hindsight'. . . and hindsight is all the [plaintiffs] offer."

*Id.* (quoting *DiLeo,* 901 F.2d at 627).  In other words, "[w]hat makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation

conflicts with the current state of facts, the charged statement must have been false."
*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997).  Here, plaintiff offers
nothing more than this sort of false logic.  His complaint fails to adequately "set forth, as
part of the circumstances constituting fraud, an explanation as to why the disputed
statement was untrue or misleading *when made.*"  *Id.* (quotations and citation omitted)
(emphasis in original); *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245,
1260 (10th Cir. 2001) ("'[A]llegations that defendants should have anticipated future
events and made certain disclosures earlier than they actually did do not suffice to
make out a claim of securities fraud.'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309
(2d Cir. 2000)).

      In lieu of pleading specific facts demonstrating that the statements were untrue
when made and supporting a strong inference of scienter, plaintiff instead relies upon
pure volume, as noted above.  The complaint excerpts long passages including
numerous statements and, to a large degree, leaves the Court to the task of teasing out
which specific statements are at issue, this despite the fact that the operative complaint
is the second complaint filed since the consolidation of the related matters.  Such
"puzzle pleading" is an improper means of pleading a claim.  *See Plumbers and
Pipefitters Local Union 719 Pension Fund v. Zimmer*, 673 F. Supp. 2d 718, 733 n.14
(S.D. Ind. 2009) ("Plaintiffs have, to a large degree, employed a 'puzzle pleading'
method, which improperly 'plac[es] the burden on the Court to sort out the alleged
misrepresentations and then match them with the corresponding adverse facts.  This
method is deficient under the pleading standards.'") (quoting *In re Alcatel Sec. Litig.*,

382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005)).  In any event, plaintiff, by so constructing his complaint, has been hoist with his own petard.  Alongside the bolded sentences plaintiff puts forward as the bases of his claims can be found sufficient context and caveat to demonstrate that no claim for relief has been stated as required by the PSLRA.

Plaintiff attempts to plead securities fraud by pointing out that poor management decisions were made, e.g., the firing of legacy employees with relevant experience. The individual defendants, however, admitted that this was a mistake.  Contrary to plaintiff's argument, this does not reveal that the statements were materially false or misleading, but rather that defendants made poor business judgments and later realized the true impact of them.  *See* Docket No. 100 at 56, ¶ 97 ("[W]e made several decisions which, while reasonable at the time, when viewed in retrospect today made achieving our provisioning targets more difficult."); *New York State Teachers' Retirement Systems v. Fremont General Corp.*, No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574, at *6-7 (C.D. Cal. Sep. 25, 2009) ("[E]ven taking all the factual allegations in the SAC as true, they are less likely to support an inference of securities fraud than they are to support an inference of profoundly misguided corporate mismanagement.") (citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479-80 (1977) ("We thus adhere to the position that Congress by [§ ] 10(b) did not seek to regulate transactions which constitute no more than internal corporate management.  There may well be a need for uniform federal fiduciary standards to govern mergers such as that challenged in this complaint.  But those standards should not be supplied by judicial extension of § 10(b) and Rule 10b-5 to cover the corporate universe." (internal quotations, citations,

and footnotes omitted)).

The complaint tells a story of executives who, while recognizing some difficulties with integration, were optimistic about their ability to address those inefficiencies promptly and reap the benefits of integrating the acquired companies.  These aspirational statements were not material misstatements.  *See In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) ("Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" (collecting cases)).  That defendants stated that the integrations were mostly, significantly, and substantially completed, and even placed a percentage figure on the progress being made, does not necessarily upset that conclusion.  *See New York State Teachers' Retirement Systems*, 2009 WL 3112574, at *10 ("[N]either Bailey's generalization that he thought the company *tended* to play "at the upper end" of the sub-prime spectrum nor the 10-Q statement that the company *sought* to mitigate its exposure through standards that *strove* to ensure valuations constitute materially false statements.") (emphasis in original).

Even assuming the defendants' assurances regarding the progress they were making were material misstatements, the complaint lacks factual allegations supporting a strong inference of scienter, if any inference at all.  In assessing the complaint's allegations regarding scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.  In sum the reviewing court must

ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326 (citation omitted).  Here, the answer is "no." Plaintiff has failed to "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id.* at 328 (emphasis removed).  The allegations simply do not evidence any "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  Nor do they describe "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996) (quotations and citation omitted).

Rather, the complaint depicts defendants who were optimistic that integration would occur smoothly in no small part due to their belief that Level 3 was a "logical consolidator with proven integration experience."  Docket No. 100 at 36, ¶ 65; *see* Docket No. 100 at 36, ¶¶ 66-67.  Upon realizing that the integration of the companies was not going as planned, Level 3 revealed that fact during the Class Period.  Indeed, management's statements reflect a point emphasized by plaintiff in his complaint, namely, that defendants made poor decisions that lowered short-term costs at the expense of long-term efficiency.  Defendant Crowe admitted as much on October 23, 2007 when he told analysts and investors that "we . . . laid off people familiar with each of these individual order entry systems, inventory, provisioning and other systems, before we had assured we could meet our provisioning targets," and that "we paid close

21

attention to sales and integration cost targets," but failed to "monitor detailed operational metrics as closely as we should have."  Docket No. 100 at 115, ¶ 186.  He further stated that defendants "took [their] eye[s] off the detailed essential work of end to end provisioning that is critical to provisioning success."  *Id.*  These are acknowledgments of mistakes, not misstatements.  They thus fall well short of supporting a strong inference of scienter.

In arguing the contrary, plaintiff relies upon *In re ICG Commc'ns, Inc. Sec. Litig.*, No. 00-cv-01864-REB-BNB, 2006 WL 416622 (D. Colo. Feb. 7, 2006), where he contends "[r]emarkably similar allegations have survived a Rule 12(b)(6) motion."  Docket No. 109 at 26.  Plaintiff contends that *ICG* involved defendants failing to reveal network and customer service problems.  In *ICG*, however, defendants were alleged to have artificially inflated the number of internet data transmission lines that were revenue producing.  *See ICG*, 2006 WL 416622, at *4-5.  The complaint alleged the defendants affirmatively reported fictitious and inflated numbers in order to mislead the investing public.  For example, one of the defendants "instructed ICG staff to add uninstalled lines" to the database where revenue producing lines were recorded.  *Id.* at *5.  After a meeting with ICG employees during which the same defendant revealed that "ICG was 106,000 lines short of its quarterly objective," ICG staff members "could hear the ICG wholesale group being told to write orders for 25,000 to 50,000 lines, regardless of whether a purchaser or ISP was involved."  *Id.*  At the same time, the company was experiencing an onslaught of customer complaints, requiring ICG to issue large credits which the company did not include in its reported revenues.  *Id.* at *7.  As

for knowledge of the customer service problems, the *ICG* court made clear that "if the defendants knew of these problems, but believed they could be fixed in a reasonable time, they are not liable for securities fraud for failing to reveal the problems publically." *Id.* at *11. Ultimately, the court concluded that the complaint adequately alleged that one of the defendants knew of the problems and that they "could not be fixed." *Id.* at *12.

To compare such allegations to those here only highlights the weakness of plaintiff's complaint. There are no factual allegations indicating that the Level 3 executives were engaged in artificially inflating reported numbers or instructing employees to mask the truth of what was truly happening. That defendants expressed optimism in their ability to successfully fix those problems does not make their statements knowingly or recklessly false or misleading when made. Indeed, upon realizing that they would not be able to get things under control, they disclosed that fact.[9] Plaintiff would have this Court equate recognizing past mistakes with admitting fraud. The Court declines to do so.[10]

### D. Dismissal With Prejudice

Plaintiff notes at the end of his response to defendants' motion that, "[i]f for any reason the Court finds plaintiff's allegations lacking, plaintiff respectfully requests leave

---

[9]The Court also finds that plaintiff's contentions regarding defendants' potential motive for making the statements do not support a strong inference of scienter.

[10]Plaintiff also alleged a violation of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Because plaintiff has failed to plead a "primary violation of the securities laws," he also has failed to adequately plead a Section 20(a) violation. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).

to amend." Docket No. 109 at 32 n.19. Plaintiff, however, has not filed a motion to amend the complaint. The Local Rules of this District state that a "motion shall not be included in a response or reply to the original motion," D.C.COLO.LCivR 7.1C, and the Federal Rules of Civil Procedure require that a "request for a court order must be made by motion." Fed. R. Civ. P. 7(b)(1). There is, therefore, no pending request to amend the complaint requiring the Court's attention. *See Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186-87 (10th Cir. 1999) ("[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it."). Plaintiff will not be afforded another opportunity to amend his complaint in this action.

Nor does plaintiff explain what, if anything, he could do to remedy the deficiencies in his complaint. This case is a consolidation of four separately-filed cases, each of which was initiated by a complaint alleging the claims addressed above. After consolidation and the filing of the first consolidated class action complaint, plaintiff received the benefit of defendants' motion to dismiss and, thereafter, requested leave to file the now-operative complaint. Plaintiff identifies no reason to provide him another bite at the apple. *See In re Bio-Technology General Corp.*, No. CIV.A. 02-6048(HAA), 2006 WL 3068553, at *14 (D.N.J. Oct. 26, 2006) ("Plaintiff's first Complaint of 128 pages was dismissed for failure to plead with particularity. The SAC at issue now is approximately 162 pages and still fails to satisfy the heightened pleading standards, for largely the same reasons. In essence, Plaintiff has had two large bites at the apple and the Court is convinced that a third would not render a different result.").

24

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' motion to dismiss [Docket No. 103] is GRANTED.

Plaintiffs' amended consolidated class action complaint is dismissed with prejudice.

Judgment shall enter in favor of defendants and against the consolidated plaintiffs.  It is

further

**ORDERED** that defendants' motion requesting judicial notice [Docket No. 106] is

DENIED as moot.

DATED December 10, 2010.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge